IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, ) ) ) Plaintiff, ) v. ) ) NEW WORLD HOLDINGS, LLC, GRACE ) ELIZABETH REISINGER, and STEVEN DAVID ) ERDMAN, ) ) Defendants. ) | No. 10 C 4557 Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Plaintiff U.S. Commodity Futures Trading Commission has brought a three count complaint against defendants New World Holdings, LLC, ("NWH"), Grace Reisinger and Steven Erdman seeking equitable relief and civil penalties for defendants' alleged violations of § 4g(a) of the Commodities Exchange Act (the "Act"), 7 U.S.C. § 6g(a), and Commission Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31, 1.35. Specifically, Count I charges NWH with failing to keep full, complete and systematic records of all transactions dealing in commodities futures, commodities options and cash commodities in violation of § 4g(a) and Regulation 1.35. Count I also charges Reisinger and Erdman with aiding and abetting that alleged violation. Count II charges NWH with failing to keep required books and records in violation of § 4g(a) and Regulation 1.31. Again, Count II charges Reisinger and Erdman with aiding and abetting liability. Finally, Count III charges Erdman and NWH with violating Regulation 166.3, by not supervising Reisinger and allowing her to violate § 4g(a), and charges NWH for failing to supervise Erdman. The parties have filed cross-motions for summary judgment. Because material facts remain in dispute, both motions are denied.

**BACKGROUND**[1]

NWH is an introducing broker ("IB"), meaning it is engaged for compensation or profit in soliciting or accepting orders for the purchase or sale of commodities. Erdman is a principal of NWH and one of its associated persons ("AP"). Reisinger was the branch manager of NWH's Grand Island, Nebraska branch office, a one-broker office located in her home, and an AP of NWH. During the relevant period Cadent Financial Services, LLC ("Cadent") was a registered futures commission merchant ("FCM"), and acted as a full service broker that held money and trades for NWH customers.

In early October 2006 NWH, through Reisinger and Erdman, introduced an account to Cadent in the name of the Idylic Solutions Pty. Ltd. ("Idylic"), an Australian corporation. In addition to the Idylic account, NWH also introduced Unifund Ltd., 888 Management Inc., Secured Bond Ltd., and Sagacity, Ltd. (together with Idylic the "Introduced Accounts"), to Cadent. The customers for the Introduced Accounts were all foreign corporations. Deposits into the Idylic and other Introduced Accounts exceeded $21 million. The trading in the accounts was profitable and distributions to the customers exceeded the amounts deposited. NWH used a form required by Candent to open the accounts. That form, titled "Exemption for Foreign Entities," which was completed by the customer for each account, provides:

> The account is a proprietary account of the above-named entity and funds have not been solicited from third parties or other entities for deposit into this account. This company does not solicit funds for trading and will not do so in the future.

\* \* \* \*

---

[1]The parties have filed a stipulated statement of facts in addition to the statements required in L.R. 56.1.

In the event that either of the above representations is no longer accurate, we will alert Cadent in writing immediately.

NWH maintained copies of the completed forms for the Introduced Accounts in the ordinary course of business. The form is not a CFTC form, but was designed and required by Cadent.

On or about August 20, 2007, Reisinger and Erdman received an email from Con Kotsoukas, a principal of the Idylic account, stating:

> Hi, guys. I know I've thanked you both before, but I want to thank you again. Should have seen the happy looks on some of our clients' faces when we told them that they will receive profit against his quarter, period, (that's three quarters in a row). It's days like this that make it all worth it and this fund will really really fly now. Thanks again and keep up the good work. Regards and God bless.

During the period in question, Erdman was an officer and managing principal of NWH and Reisinger's direct supervisor. He was solely responsible for hiring Reisinger and it was Erdman who allowed Reisinger to set up and operate NWH's Grand Island, Nebraska branch office out of her residence. Erdman was in actual control of NWH's day-to-day operations and the sole person within NWH responsible for supervising Reisinger. He did not visit the Grand Island branch office during the relevant period. Sometime prior to February 5, 2009, some emails relating to communications by Reisinger with some of NWH's actual or prospective clients were deleted by Reisinger in the ordinary course of business.

## **DISCUSSION**

The parties have filed cross-motions for summary judgment. Summary judgment is appropriate when the moving party shows that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears

the initial burden of asserting the absence of a genuine issue of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and must support that assertion by citing to materials in the record. Fed. R. Civ. P. 56(c)(1)(A). Once the movant has met that burden, the nonmoving party can defeat summary judgment by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994). The court therefore draws all reasonable inferences in the light most favorable to the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992).

In Counts I and II plaintiff has charged defendants with violating § 4g(a) and the record keeping requirements of Regulations 1.31 and 1.35. Section 4g(a) provides that every person registered as an FCM, IB, floor broker, or floor trader shall keep books and records pertaining to transactions and positions of their customers and commodities for future delivery, and shall make such records available to inspection by the Commission. Regulation 1.31(a)(1), 17 C.F.R. 1.31(a)(1) provides that "all books and records required to be kept by the Act or by these regulations shall be kept for a period of five years from the date thereof and shall be readily accessible for the first 2-years of the 5-year period." Regulation 1.35(a), 17 C.F.R. 1.35(a), entitled "Records of Cash Commodity, Futures and Option Transactions," provides:

> (a) . . . Each future commission merchant, retail foreign exchange dealer, Introducing Broker, and member of a contract market shall keep full, complete,

> and systematic records, together with all pertinent data and memoranda, of all transactions relating to its business of dealing in commodity futures, retail forex transactions, commodity options and cash commodities (including currency). . . . Included among such records shall be call orders . . . trading cards, signature cards, street books, journals, ledgers, cancelled checks, copies of confirmations, copies of statements of purchase and sale, and all other records, data and memoranda which have been prepared in the course of its business of dealing in commodity futures, commodity options and cash commodities.

Plaintiff contends that defendants have violated the statute and regulations in two distinct ways. First, plaintiff argues that defendants opened the Idylic account as a proprietary account knowing that Idylic was investing client money, meaning it should have been opened as a "discretionary account." Because it is undisputed that discretionary accounts (accounts that accept third-party funds) require additional paperwork and records beyond that required for proprietary accounts, plaintiff argues that defendants violated the Act by not maintaining the proper discretionary account paperwork.

Defendants do not dispute that NWH adopted Cadent's Compliance Manual for 2005 and early 2006 and then began using their own Compliance Manual in the third quarter of 2006. Nor do they dispute that Cadent's Compliance Manual required that accounts accepting third party funds be opened as discretionary accounts. Defendants do dispute, however, that the Idylic and other Introduced Accounts were discretionary and that the regulations require them ti follow the compliance manual.

As noted, all the customers signed the forms indicating that the accounts were proprietary and that no third party funds have been solicited. Reisinger testified that she knew when the Idylic account was opened that it was funded by the purchase of superannuation funds at a discount, selling units of a unit trust, and by contract. The "clients" or purchasers of the unit trust and sellers of the superannuation funds were all international business companies ("IBCs").

5

She testified that it was her understanding that all of the funds were owned by Idylic at the time the account was opened, and that she sought advice of counsel on how to open the account. She further testified that there came a point in time when she learned (from Idylic's lawyer) that Idylic did not own the funds, and in her declaration indicates that when the accounts engaged the services of the a Commodities Trading Advisor ("CTA") to trade the accounts, discretionary account documentation was obtained and sent to Cadent, with copies kept in NWH's files.

To establish that the accounts were discretionary rather than proprietary, plaintiff relies predominately on the August 20, 2007, Con Kotsoukas email stating, "Should have seen the happy looks on some of our clients' faces . . . and this fund will really really fly now." According to plaintiff, this email conclusively establishes that the Idylic account had third party investors. In response, defendants argue that Regulation 1.35 says nothing about a duty to keep records in accordance with an internal compliance manual, and that the regulation can be violated only if specific records required to be kept by the regulations are not.

Defendants are correct that nothing in Regulation 1.35 specifically requires them to keep discretionary account information, nor does plaintiff argue that it does. As defendants argue, numerous courts have held that it is not a violation for a broker to fail to follow its own internal policies or manuals. See de Kwiatkowski v. Bear, Sterns & Co., Inc., 306 F.3d 1293, 1310-11 (2d 2002) (collecting cases). Plaintiff argues, however, that by introducing what it terms de facto discretionary accounts as proprietary, defendants avoided the requirement to maintain or produce a Management Account Authorization/Power of Attorney form, documentation showing that the third party controller was registered with the Commission, insuring that each transaction for the account was labeled with a "D" to indicate discretionary. It is unclear, however, whether

6

plaintiff argues that these documents were required by Cadent's Internal Compliance Manual or by the regulations themselves.

Whether the Idylic and other Introduced Accounts were properly opened as proprietary, and if not, whether the proper records were maintained, cannot be determined by the current record. How Idylic acquired the funds invested in to the account and whether it or third parties owned those funds remains in dispute. Although Kotsoukas' email suggests that the accounts had "clients" and were thus discretionary, his deposition has not been provided and it is unclear that he used the term "clients" to mean third party investors. It is entirely possible that he was referring to the other principal owners of each specific account. Because key facts remain in dispute, neither plaintiffs nor defendants are entitled to summary judgment on this issue.

Plaintiff next argues that defendants violated the Act and Regulation 1.35 by Reisinger's deletion of certain emails in the ordinary course of business. It is undisputed that both Reisinger and Erdman used email in the ordinary course of their business, including communicating with their customers concerning the Idylic accounts. It is also undisputed that Reisinger deleted some emails. The content or even subject of those emails is unknown.

The parties spend a great deal of effort arguing over whether email constitutes business records subject to the regulations. According to defendants, plaintiff is precluded from enforcing such a position against Reisinger because all of her actions took place before February 5, 2009, when plaintiff issued an "Advisory" clarifying its position that the regulations apply to records that are created or maintained in electronic format, including email. As plaintiff notes, however, the Advisory was simply a clarification of the position it had always taken, which required that records, in any format, must be retained.

7

The records required to be retained by the regulation, however, are records of transactions. Regulation 1.35(a) provides that each FCM, IB, . . . shall keep full complete and systematic records . . . of all transaction . . .." The regulation lists specific types of records to be maintained, such as orders, trading cards, cancelled checks and confirmation statements all of which relate to transactions. Nothing in the regulation or any interpretations submitted by plaintiff suggest that every email communication, even those that do not relate to specific transactions, must be retained. Even the catch-all language at the end of the regulation refers back to records of transactions. Indeed, that the regulation does not apply to all communications is demonstrated by a proposal to add language at the end of the catch-all provision providing (76 Fed. Reg. at 33091):

> ... and all oral and written communications provided or received concerning quotes, solicitations, bids, offers, instructions, trading and prices, that lend to the execution of transactions in a commodity interest or cash commodity, whether communicated by telephone, voice mail, facsimile, instant messaging, chat rooms, electronic mail, mobile devise or other digital or electronic media.

Because the content of the emails deleted by Reisinger is unknown, the court is unable to determine if they related to transactions and were required to be maintained, or if they were simply communications unrelated to specific transactions and not covered by the regulations. Accordingly, because these material facts remain in dispute, both plaintiff's and defendants' motions for summary judgment are denied as to Counts I and II.

Finally, plaintiff's claims in Count III for failure to supervise are based on Reisinger's failure to maintain the proper records. Denial of summary judgment on Counts I and II requires denial of summary judgment on Count III.

## **CONCLUSION**

For the reasons described above, both plaintiff's and defendants' cross motions for summary judgment (Docs. 34,38) are denied. This matter is set for a report on status on April 10, 2012, at 9:00 a.m.


**ENTER:** March 21, 2012

_____
**Robert W. Gettleman
United States District Judge**